# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN ALLIANCE FOR EQUAL RIGHTS**<br>5801 Golden Triangle Blvd Ste. 103-182,<br>Fort Worth, TX 76244,<br><br>**DEFENDING EDUCATION**<br>4532 Cherry Hill Road, Suite 119<br>Arlington, VA 22207,<br><br>*Plaintiffs*,<br><br>v.<br><br>**CONGRESSIONAL BLACK CAUCUS FOUNDATION**<br>1225 I St. NW, Suite 550<br>Washington, D.C. 20005,<br>*Defendant*. | Case No. 1:26-cv-1123 |

# SECOND AMENDED COMPLAINT

1. The Congressional Black Caucus Foundation awards educational opportunities to some young Americans but not to others based on skin color. The Foundation's CBC Spouses Education Scholarship awards lucrative scholarships, but only to students who are "African American and Black." The Foundation also requires applicants to live or study in a jurisdiction represented by a member of the "Congressional Black Caucus." Racial gerrymandering is illegal when sorting voters on a legislative map. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). It is no less illegal when affording educational opportunities to young people. *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954).

2. The Civil Rights Act of 1866, better known as §1981, guarantees all persons "the equal right … to make and enforce contracts without respect to race." *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Because the Foundation's scholarship involves contracts, it implicates 42 U.S.C. §1981. And because the scholarship's racial discrimination fails strict scrutiny, it is illegal.

3. Plaintiffs have members who could not compete for the CBC Spouses Education Scholarship in the past and who are able and ready to apply in the future, should a court make the program equally open to all races. They are entitled to relief.

## PARTIES

4. The American Alliance for Equal Rights is a nationwide membership organization dedicated to ending racial classifications across America. This challenge to racial discrimination falls squarely within the Alliance's mission. *E.g.*, *AAER v. Fearless Fund*, 103 F.4th 765 (11th Cir. 2024) (blacks-only grant); *AAER v. ABA*, 2026 WL 161596 (N.D. Ill. Jan. 21) (nonwhites-only scholarship); *AAER v. Founders First*, 2024 WL 3625684 (N.D. Tex. July 31) (nonwhites-only grant).

5. The Alliance was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization the same year. The Alliance has more than 300 members, and its membership continues to grow.

6. The Alliance's standing members are actively involved in the organization. Members voluntarily join. They pay dues. They receive regular updates. And they offer

input on the Alliance's activities. The Alliance represents its standing members in good faith.

7. Defending Education is a nationwide, grassroots, 501(c)(3) membership organization whose members include students, parents, and others who are concerned about the state of education in America. Defending Education is dedicated to preserving civil rights secured by law, including the right to be free from illegal discrimination. This challenge to racial discrimination in education falls squarely within Defending Education's mission. *E.g.*, *IntegrateNYC, Inc. v. State*, 45 N.Y.3d 176 (2025); *Parents Defending Educ. v. Wellesley Pub. Schs.*, No. 1:21-cv-11709 (D. Mass.).

8. Defending Education was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization that same year. Defending Education has more than 12,000 members, and its membership continues to grow.

9. Defending Education's standing members are actively involved in the organization. Members voluntarily join. They pay dues. They receive regular updates. And they offer input on Defending Education's activities. Defending Education represents its standing members in good faith.

10. The CBC Foundation is a 501(c)(3) nonprofit. It is a legally distinct entity from the Congressional Black Caucus. The Foundation states that it takes no position on legislation or regulatory matters before Congress or any other government agency; and as a 501(c)(3), the Foundation is legally constrained from trying to "influence

legislation." 26 U.S.C. §501(c)(3). The Foundation is led by a team of professional staff, none of whom are members of Congress or legislative aides.

11. The Foundation offers scholarship opportunities to students nationwide, including the CBC Spouses Education Scholarship at issue here. This scholarship is run by the CBC Spouses organization, a "component" of the Foundation comprised of the spouses of "the African American members of the United States Congress." None of the CBC Spouses are members of Congress; and by law, the spouses cannot be legislative aides. 5 U.S.C. §3110. The scholarship itself is unavailable to applicants who are an immediate relative of, or otherwise associated with, anyone in the Congressional Black Caucus, the CBC Foundation, or the CBC Spouses.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" the Civil Rights Act of 1866, a federal law.

13. Venue is proper in this district because the CBC Foundation "resides" in D.C. 28 U.S.C. §1391(b)(1). A corporation is a resident of the jurisdiction where it is incorporated, *Hazen v. NRA*, 101 F.2d 432, 437 (D.C. Cir. 1938); *Mylan Lab'ys v. Akzo, N.V.*, 1990 WL 58466, at *12 n.14 (D.D.C. Mar. 27), and the CBC Foundation is incorporated in D.C. According to the Foundation's most-recent federal tax form, D.C. is the Foundation's "State of legal domicile."

# FACTS

## I. The CBC Spouses Education Scholarship racially discriminates.

14. The Foundation started the CBC Spouses Education Scholarship in 1988. The Foundation has hosted that scholarship every year since, running the program more than thirty times in the last three decades.

15. The scholarship runs once per year. The application window opens in early January and closes in late March. In the 2026 cycle, for example, the window opened on Monday, January 5, 2026, and closed on Friday, March 27, 2026.

16. The scholarship has never taken a year off. The Foundation has not suggested that the scholarship will end or meaningfully change in 2027; its website continues to state today that the scholarship is provided "[e]ach year"; and after the close of the 2026 application window, the Foundation's president said the scholarship "will proceed" in 2027. Scholarship websites are already promoting the scholarship's 2027 cycle. The application window for that next cycle will open in the beginning of January 2027 and close in the end of March 2027.

17. According to the Foundation, the scholarship "was established in 1988 … in response to federal cuts in spending for education programs and scholarships, which disproportionately affect people of color." In the very next sentence, the Foundation explains that the scholarship is thus "open to … African-American or Black students." Its qualifications require applicants to "[b]e an African American and

Black" student and to reside or study in the jurisdiction of "a Congressional Black Caucus Member."

18. Every year since 1988, the Foundation has stated that one of the eligibility requirements for the scholarship is that applicants must be black.

19. After this lawsuit was filed on April 2, 2026, the Foundation's president submitted a declaration on July 16, 2026, to support the Foundation's motion to dismiss Plaintiffs' first amended complaint. That declaration says the Foundation, starting with the scholarship's "2026" cycle, no longer "list[ed] 'identify[ing] as Black or African-American' as an eligibility requirement."

20. If that declaration meant to suggest the scholarship was equally open to nonblack applicants in the 2026 cycle, that suggestion would be false. Like every past cycle, the 2026 cycle outright barred nonblack applicants. At a minimum, the Foundation considers whether applicants are black and gives a preference to those who are.

21. Throughout the 2026 cycle, the Foundation continued to state that nonblack applicants could not apply. For example:

a. In November 2025, when the Foundation announced the upcoming 2026 application cycle, it said its 2026 scholarship opportunities will be "supporting the next generation of Black scholars."

b. On the "Apply Here" page for the scholarship, the Foundation states that "[t]his opportunity awards scholarships to academically talented and highly motivated African-American or Black students." This statement remained

on that page throughout the 2026 application cycle, and it remains on that page today. The Foundation nowhere identifies any other race of students that it awards this scholarship "to."

c. On its FAQs page, the Foundation asks, "Who is eligible to apply for CBC Spouses Education Scholarship?" The Foundation answers, "African American[s] and Black[s]." This FAQ remained on the Foundation's website even after the 2026 application window opened.

d. In a brochure listing the Foundation's scholarships and internships, the Foundation declares that the winners of the "CBC Spouses Education" scholarship "will be … African-American or black students who reside or attend school in a CBC member district." This brochure was on the Foundation's website throughout the 2026 application cycle, and it remains on the Foundation's website today.

e. When describing its programming, the Foundation says its "commitment" is to "Black" students and the "Black community." And the Foundation states its "mission" in terms of the "Black community." These statements were up on the Foundation's website throughout the scholarship's 2026 cycle, and they remain up today.

f. On February 24, 2026—in the middle of the scholarship's 2026 application window—the Foundation posted a story about the CBC Spouses that

describes the scholarship's purpose solely in terms of "Black students." The article nowhere suggests that the scholarship recently changed, let alone that it was now open to non-black students.

22. The scholarship's application process is designed so that the Foundation can discriminate in favor of blacks.

23. To complete the application (including in the 2026 cycle), students must answer a question that says: "Please indicate your race/ethnicity." This racial question is mandatory, and applicants' answers to this question are visible to the Foundation's decisionmakers.

24. The required racial box lists only eight options: "American Indian/Alaska Native," "Asian," "Black/African American," "Hispanic/Latino," "Multi-Racial Black/African American," "Native Hawaiian/Pacific Islander," "White," and "Not Applicable." There is no option for "Prefer Not to Say" or anything similar; the "Not Applicable" box means that none of the listed races applies to this applicant. The only multiracial category is "Multi-Racial Black/African American," a limitation that makes sense only if the Foundation is discriminating in favor of blacks. If it used a generic multiracial category, a multiracial black applicant might select it instead of black, and so the Foundation could not tell from this box alone whether an applicant is non-black.

25. Even if an applicant checks the wrong box, the Foundation ensures it can know and verify his race. As part of the application, the Foundation requires applicants to submit a video of themselves giving a personal statement. These videos are reviewed by the decisionmakers at the Foundation who are responsible for choosing the scholarship's winners. The videos let the decisionmakers see each applicant's race. Students also post these video statements on YouTube; and in the posted videos (including videos from the 2026 cycle), applicants frequently state that they are black and identify the scholarship as specifically for black students.

26. Another required question on the application asks whether a student "attend[s] (or ha[s] attended) a Historically Black College or University." On average, the student body at an HBCU is around 75% black, compared to around 10% at non-HBCUs. The Foundation's application does not ask whether students attend a predominantly white institution or any other kind of minority-serving institution, like a Hispanic-Serving Institution, a Tribal College or University, or an Asian American and Native American Pacific Islander-Serving Institution.

27. The Foundation also requires applicants to "[r]eside or attend an academic institution in a CBC Member's District." CBC, of course, stands for Congressional

*Black* Caucus. The Caucus's "membership is racially exclusive." Membership is open only to Senators and Representatives who are black.[*]

28. Aside from being a facial racial classification, the Foundation adopted this CBC-member requirement for the purpose of discriminating in favor of blacks. Throughout the life of the scholarship, the CBC-member requirement helps the Foundation choose only black students by ensuring the pool of eligible applicants is disproportionately black. According to the CBC, its members represent over 40% of all black Americans. Except for one district in Tennessee that has now been redrawn, all majority-black districts are represented by a member of the CBC. Many of these districts were designed, under section 2 of the Voting Rights Act, to ensure that a concentrated black population could elect their representative of choice. And because the CBC includes U.S. Senators and D.C.'s nonvoting delegate, its members represent all of D.C., Maryland, and Georgia, which have the highest or near-highest black populations by percentage of any State.

29. The Foundation's discriminatory practices and requirements have had a totalizing racial effect. To date, every single winner of the scholarship has been black.

[*] Plaintiffs do not challenge the legality of the CBC's blacks-only membership requirement, or even question its legality under §1981, in this case. They seek to hold only the Foundation liable for its own private conduct. Plaintiffs discuss the CBC's membership requirement only as background to help explain why the Foundation itself is discriminating based on race.

Stated differently, the scholarship has awarded more than $12 million exclusively to black students for over three decades.

30. The Foundation has never offered a reason, publicly or even in litigation, why it would have stopped requiring applicants to the scholarship to be black. Before and after this lawsuit was filed and throughout the scholarship's 2026 cycle, the Foundation has continued to run contract-based scholarships, fellowships, and internships that are exclusively for blacks. For example:

a. The CBC Spouses Essay Contest is for "African-American and Black junior and senior high school students."

b. The CBC Spouses Visual Arts Scholarship gives financial assistance "to African American or Black students pursuing a degree in the visual arts."

c. The CBCF-Oxford Partnership is for "Black" students, and its stated "primary goal" is "cultivat[ing] Black" students.

d. The Congressional Internship Program is likewise for "African American students," where "[p]reference is given to applicants who reside in or attend school in CBC Member districts." The Foundation continues to claim that it places "more black interns on Capitol Hill than any other organization."

e. Applicants to the Emerging Leaders Internship must be "African American or Black students."

f. Applicants to the Communications Internship likewise must be "African American or Black students."

31. Had the Foundation changed the scholarship in 2026 to make it equally open to non-blacks, that change would have been a monumental shift in the nature of the program. As the Foundation has admitted in this litigation, non-black students were expressly ineligible every year for three straight decades. Yet before or during the 2026 cycle, the Foundation made no public announcement—on its website, to the press, on social media, or anywhere else—stating that the scholarship was now open to non-black students. The Foundation made no public suggestion to that effect of any kind until it filed its declaration in this case in July 2026, several months after the application window for the 2026 cycle closed. The Foundation made no such announcement or statement about the scholarship because it made no such change to the scholarship.

32. For the entirety of the 2026 cycle, many third-party resources on scholarships, including scholarship aggregators and universities, told students that the Foundation's 2026 scholarship was open only to blacks. The federal government's scholarship aggregator, for example, states for the scholarship's 2026 cycle that "[a]pplicants must be African American and black." No third-party website said the Foundation's scholarship is now open to non-blacks in 2026.

33. Many of these websites continue to state that, for the 2027 cycle, the scholarship will continue to be open only to blacks. Scholarships.com, for example, is "one of the most widely used and trusted search engines" for college scholarships. It

lists the Foundation's scholarship, both in 2026 and 2027, in its ranking of "The 25 Best Scholarships for Black Students."

34. These sources get their information from the Foundation. And they have an incentive to be accurate: The websites want students to trust them as a source of accurate information (thus driving visits and advertising revenue), and the universities do not want to discourage their own students from pursuing scholarships by stating eligibility restrictions that do not exist. These sources did not report a change to the scholarship's criteria because no such change was made.

35. On information and belief, including a review of the video submissions on YouTube for the scholarship's 2026 cycle, the submissions for past cycles, the announced winners for past cycles, and posts from applicants on social media for the 2026 cycle, and the Foundation's refusal to announce winners, the applicant pool for the scholarship's 2026 cycle was almost exclusively black students. The Foundation has the complete set of actual applications, video submissions, and other materials, which Plaintiffs could get in discovery to prove the percentage of applicants in 2026 who identified as black.

36. Even after this lawsuit was filed, the Foundation has not issued a public statement announcing that the scholarship was changed in 2026 to no longer require applicants to be black. In its post-lawsuit statements to the public, the Foundation tries to create the impression that the scholarship was *not* changed. For example:

a. When this lawsuit was filed in April 2026, the Foundation's president issued a statement to the press, stressing that the Foundation was "proud to reaffirm" its original mission and "remains committed" to its original goals.

b. In a press release in July 2026, the Foundation's president said this lawsuit "target[s]" the scholarship because it "advance[s] the Black community." And after describing the scholarship as a continuous program spanning "40 … years," the Foundation's president said the scholarship "will proceed."

c. On social media in July 2026, the Foundation summarized its position in this lawsuit as "reaffirming CBCF's commitment to the scholarship and to the communities it serves."

d. In another social-media post from July 2026, the Foundation said, "For 50 years, we have been advancing the global Black community" and that, in the face of this lawsuit, "[w]e are standing firm and continuing our mission."

37. After this lawsuit was filed, but before the Foundation landed on the legal strategy of denying that the scholarship is open only to blacks, the Foundation's supporters confirmed that the scholarship is limited to blacks. These allies of the Foundation, all writing in support of the scholarship, had an incentive not to undermine the Foundation's defense by misdescribing the scholarship's criteria as discriminatory. No reporter, outlet, or commentator said during this time that the lawsuit was mistaken because the scholarship is not limited to blacks. In April 2026 alone, for example:

a. A civil-rights group said "[t]he CBCF scholarship exists specifically to help Black students." The Journal of Blacks in Higher Education echoed that "[t]he scholarship program in question is available to African American and Black students who reside or attend school in a congressional district represented by a member of the CBC."

b. A legal blog decried that "Ed Blum Is Trying to Keep Black Kids Out of School Again" by targeting "a Congressional Black Caucus scholarship program for Black students in their districts."

c. Another outlet wrote about the lawsuit while acknowledging that the Foundation's "website and materials openly state the racial eligibility criteria for this and some other programs."

d. Another news outlet described the scholarship as "open to Black students who live in the district of one of the members of the CBC," criticizing this lawsuit as "the latest attack on programs aimed at benefiting Black students" with "larger ramifications for programs intended to provide educational opportunities to young Black people."

e. A civil-rights lawyer said the program provides scholarships to "black students attending underfunded schools in majority black congressional districts," and "[i]t was created precisely because, as the foundation stated, … black students were navigating inequitable education systems."

38. In past application cycles, the Foundation has consistently chosen the scholarship's winners in the last week of July or the first week of August. That timing ensures the winners have the money before the school year starts in the fall.

39. But after this lawsuit was filed in April 2026, the Foundation decided to deviate from the normal timeline. The Foundation chose to indefinitely delay selecting winners for the 2026 cycle. When applicants call the Foundation asking for an update, they are told that the process is not proceeding on the normal timeline and to call back in early September—conveniently right after Plaintiffs' August 31 deadline to respond to the Foundation's motion to dismiss.

40. This unprecedented delay confirms that the applicant pool for the 2026 cycle is overwhelmingly black and that the Foundation has always intended to select only black students; but the Foundation is strategically delaying picking the winners because of this lawsuit in the hopes of strengthening its litigating position.

41. The Foundation does not sincerely believe that using its scholarship to discriminate in favor of black students expresses a message. Though it continues to engage in that discrimination, it now states that it has no objection to the scholarship being "open to applicants of all races." As a 501(c)(3), moreover, the Foundation agreed not to racially discriminate in exchange for the benefits of tax exemption. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 595 (1983).

## II. The scholarship is contractual.

42. The Foundation's scholarship is contractual in nature.

43. The scholarship itself is a contest. The Foundation's scholarships are highly competitive, awarding less than 400 scholarships a year despite receiving over 3,000 applications. When selecting winners, the CBC Foundation considers only the most "talented" students. The Foundation picks winners based on the best "[p]ersonal [s]tatement," where applicants must write and produce a unique, three-minute video.

44. When students apply, they get the chance to compete for lucrative "awards." Those awards range "from $2,500 - $20,000" in scholarship money.

45. In exchange for a chance to compete for the prizes, applicants must agree to a license. The application requires applicants to sign a license that says, "I further hereby give permission to CBCF to use or publish any photos, text, artwork, and information submitted to this application."

46. The information that students must license away—including their name, image, and likeness; their private information; and their intellectual property—is valuable. The license covers the applicant's "[v]ideo [r]esponse" containing their unique "[p]ersonal [s]tatement." And it covers the applicant's resume, "transcript(s)," and personal "information" like their name, gender, birthday, citizenship status, military status, race, address, phone number, undergraduate information, and GPA.

47. The information that students must license away is also valuable to the Foundation. The Foundation regularly uses this applicant information in its annual publications. And those publications are marketing materials that the Foundation uses to generate goodwill and to solicit money from "donors."

48. The Foundation treats its scholarship program as involving binding contracts. When students apply, the Foundation makes them "certify that all information in this application is true and accurate," warning them that "any misrepresentation will result in the disqualification of [their] application." And immediately after that certification, the Foundation makes applicants provide their "Electronic Signature."

49. When students apply, they also must use the Foundation's online portal and create an account. By creating an account, applicants must "agre[e] to the Blackbaud Terms of Use and Privacy Policy." Both agreements are contracts.

50. Under the terms of use, for example, the Foundation's provider gives applicants a "license" to use the online platform to apply for the scholarship. In return, applicants must agree that their submitted materials "become the property of Blackbaud," that they will waive certain liabilities, and that they will accept a class-action waiver and a choice-of-law clause. The terms of use describe entities like the Foundation as Blackbaud's "partners" and identify them as a "third party" with rights.

## III. The scholarship injures Plaintiffs' members.

51. The Alliance has members who are being harmed by the Foundation's discrimination, including Students A and B. The Alliance's standing members all authorized the Alliance to vindicate their rights in this suit because they lack the expertise and resources to bring a lawsuit themselves. And all are ready and able to apply for the scholarship at the next open opportunity, including the cycle that is scheduled to begin in January 2027, once a court grants adequate relief.

52. **Student A:** Student A satisfies all the objective minimum eligibility criteria for the scholarship, aside from the one requiring him to be black. Student A is Asian.

a. Student A is a U.S. citizen.

b. He has a nearly perfect GPA.

c. He is a rising college freshman who will study full time at an accredited university in the fall.

d. He is not an immediate relative of, or otherwise associated with, anyone in the Congressional Black Caucus, the CBC Foundation, or the CBC Spouses.

e. He lives in a jurisdiction that is represented by a Congressional Black Caucus member. And the college he will soon attend is also represented by a Congressional Black Caucus member.

53. Student A exhibits leadership and is active in his community. Among other things, he co-founded an organization that helps educate students in his community.

54. Student A is sincerely interested in applying for and winning the scholarship.

a. This fall, Student A will attend a university where tuition costs well over $50,000 per year. Without scholarships, Student A must take out tens of thousands of dollars in loans.

b. Student A has applied for many scholarships, including one offered by a university and one offered by a private company. He has opted into all scholarship opportunities that were offered as part of his undergraduate applications.

c. Despite the futility, Student A applied to the CBC Spouses Education Scholarship during the 2026 cycle. In March 2026, Student A submitted his application to the Foundation, filling out all the required information, answering all the required questions, uploading all the required documents, and clicking submit before the March 27 deadline. He spent substantial time completing the application, coordinating a letter of recommendation, reviewing his resume, and completing his personal statement. But because he is not black, the Foundation will not consider his application, treat him fairly, or award him any money—absent judicial relief.

55. Student A remains ready and able to apply again in 2027, 2028, 2029, and 2030, when he will be a college freshman, sophomore, junior, and senior respectively. If a court ordered the CBC Foundation to make its scholarship equally open to all races, Student A would immediately apply at the next open opportunity, including for the 2027 cycle that will begin next January. Student A already has his application materials from 2026, which he can consult and use again when he reapplies.

56. **Student B:** Student B satisfies all the objective minimum eligibility criteria for the scholarship, aside from the ones requiring him and his representative to be

black. Student B is Hispanic. And he does not live or attend school in a district represented by a CBC member.

a. Student B is a U.S. citizen.

b. He has over a 3.7 GPA.

c. He is a graduate student who goes to school full time at an accredited university in the Northeast.

d. He is not an immediate relative of, or otherwise associated with, anyone in the Congressional Black Caucus, CBC Foundation, or the CBC Spouses.

57. Student B exhibits leadership and is active in the community. Among other things, Student B is a leader at his local church. He is active in his local conservation association. And he volunteers at a local animal-rescue organization.

58. Student B is sincerely interested in applying for and winning the scholarship. Throughout his time in college and graduate school, Student B has regularly sought out scholarships.

59. Student B wanted to apply to the CBC Spouses Education Scholarship during the 2026 cycle. While the application window was still open, Student B filled out all the required information, including his name, gender, birthday, citizenship status, military status, work authorization, race, address, cell-phone number, programmatic interests, first-generation college status, undergraduate-degree status, intended major, and GPA. He also prepared an outline for his video personal statement. He

would have given "permission to [the Foundation] to use or publish any photos, text, artwork, and information submitted to this application." He also would have "certif[ied] that all information in this application is true and accurate." And he would have provided his "Electronic Signature," along with the "Date" that he signed the application, all before the March 27 deadline.

60. Student B did not take the last step of clicking "submit," however, because of the Foundation's racial discrimination. Student B is not black. He does not live or attend school in a CBC member's district. And Student B's representatives cannot join the Congressional Black Caucus because they are not black either. But for these racial requirements, Student B would have timely submitted his completed application and competed for the funds in the 2026 cycle. But when the application window closed on March 27, 2026, he permanently lost the opportunity to do so.

61. Student B remains ready and able to apply for the scholarship. If a court ordered the Foundation to make its scholarship equally open to all students, regardless of their race and the race of their representatives, then Student B would immediately apply at the next available opportunity, including the next cycle of the scholarship that will open in January 2027. Student B still has his application materials from the 2026 cycle, which he can consult and use again in a future cycle.

62. Students A and B are not the only members of the Alliance who are able and ready to apply for the scholarship once a court orders adequate relief.

63. Defending Education also has members who are being harmed by the Foundation's discrimination, including Student A and Student 1. Defending Education's standing members all authorized Defending Education to vindicate their rights in this suit because they lack the expertise and resources to bring a lawsuit themselves. And all are ready and able to apply for the scholarship at the next open opportunity, including the cycle that is scheduled to close in March 2027, once a court grants adequate relief.

64. **Student 1:** Student 1 satisfies all the objective minimum eligibility criteria for the scholarship, aside from the one requiring him to be black. Student 1 is white.

a. Student 1 is a U.S. citizen.

b. He has a cumulative GPA that is above a 2.5 on a 4.0 scale.

c. He is a rising second-year law student who is studying full time at an accredited university.

d. He is not an immediate relative of, or otherwise associated with, anyone in the Congressional Black Caucus, the CBC Foundation, or the CBC Spouses.

65. Student 1 lives in a jurisdiction that is represented by a Congressional Black Caucus member.

66. Student 1 also exhibits leadership and is active in the community. Student 1 is a member of multiple student organizations on campus. When Student 1 was an undergraduate student, he was a research assistant for a professor.

67. Student 1 is ready and able to apply for the CBC Foundation's 2027 Spouses Education Scholarship, especially once a court orders the Foundation to stop discriminating.

68. After the scholarship application opens in the spring of 2027, Student 1 would fill out and submit a completed application before the deadline. He would include the required video response, transcript, and resume. He would also include all the other required information, like his name, gender, birthday, citizenship status, military status, work authorization, race, address, cell-phone number, programmatic interests, first-generation college status, undergraduate-degree status, intended major, and GPA. He would give permission to the CBC Foundation to use or publish any photos, text, artwork, and information submitted in his application. He would certify that all information in that application is true and accurate. He would provide his electronic signature, along with the date that he signs the application. And he would complete any other steps that the 2027 application requires.

69. Student 1 cannot apply to the CBC Foundation's 2027 Spouses Education Scholarship because of the scholarship's racial requirements. The scholarship is open only to black students, but Student 1 is white. So he cannot apply for the scholarship even though his Congressional representative is a member of the Congressional Black Caucus. If he applied anyway, the Foundation would not consider his application, treat him fairly, or award him any money—absent judicial relief.

70. After the deadline passes for the 2027 Spouses Education Scholarship, Student 1 will forever lose that opportunity to apply for or get scholarship money in the normal course. Student 1 feels it is wrong and insulting to deny people scholarship opportunities based on immutable characteristics like race.

71. Even though the CBC Foundation's racial discrimination is preventing Student 1 from competing for the scholarship, he remains ready and able to apply in 2027 or a later cycle. If a court orders the CBC Foundation to make its scholarship equally open to all students—regardless of race—Student 1 would immediately apply during the next round, which opens and closes in early 2027. The application process will be easy for him because he has several months to prepare and submit his application before the March 2027 deadline. Student 1 will remain ready and able to apply in the spring of 2028.

72. Student 1 sincerely wants to apply for the scholarship in 2027 and 2028. Student 1 has applied to other scholarships throughout his college career. And he wants a chance to win one of the Foundation's awards because it could save him thousands of dollars in tuition.

73. Students 1 and A are not the only members of Defending Education who are able and ready to apply for the scholarship once a court orders adequate relief.

## CLAIM FOR RELIEF
## Violation of 42 U.S.C. §1981

74. Plaintiffs repeat and restate each of their prior allegations.

75. Under §1981, "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts." 42 U.S.C. §1981(a). The statute "provides a cause of action" for private plaintiffs to sue in federal court. *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986); *accord Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

76. Section 1981 covers the CBC Foundation. The statute explicitly bars "nongovernmental discrimination." 42 U.S.C. §1981(c); *accord Johnson*, 421 U.S. at 459-60. It covers "private parties" like the Foundation who discriminate in contracting. *Fearless Fund*, 103 F.4th at 769; *accord Founders First*, 2024 WL 3625684, at *1 (applying §1981 to "a nonprofit organization").

77. Section 1981 also covers discrimination against nonblack persons, including Plaintiffs' members. The statute prohibits discrimination "'against, or in favor of, any race.'" *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). Titled "Equal rights under the law," Section 1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), thus protecting "the equal right of all persons … to make and enforce contracts without respect to race," *Domino's*, 546 U.S. at 474 (cleaned up). Section 1981's "broad terms" ban discrimination against "any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-96 (1976).

78. The CBC Spouses Education Scholarship is a "contrac[t]." 42 U.S.C. §1981(a). The program offers applicants a shot at lucrative scholarships in exchange for a license to use their intellectual property, personal information, and more. *Supra*

¶¶42-50; *ABA*, 2026 WL 161596, at *7-8; *Fearless Fund*, 103 F.4th at 775; *Founders First*, 2024 WL 3625684, at *3 n.7. It is also a contest, *supra* ¶¶43-44, a type of unilateral contract covered by §1981. *See AAER v. Fearless Fund*, 2023 WL 6295121, at *4 (N.D. Ga. Sept. 27), *aff'd in relevant part*, 103 F.4th at 765 (agreeing that "courts construe contests as offers for a unilateral contract"); *accord Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1104 (10th Cir. 2001); *Personavera v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8).

79. The Foundation intentionally discriminates based on race by preferring applicants who are black, including in the 2026 cycle. The Foundation has a conceded three-decade-long track record of "historical discrimination." *Rogers v. Lodge*, 458 U.S. 613, 625 (1982).

80. It continues to facially bar applicants who are not black. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006); *see supra* ¶¶18-31. The Foundation has also expressed a "desire to avoid" contracting with non-blacks by repeatedly stating that the scholarship is for blacks or meant to help blacks. *Amini*, 440 F.3d at 359 (cleaned up); *see supra* ¶21(a)-(f). The Foundation also asks applicants for their race and requires applicants to appear by video without blinding decisionmakers to that information, *supra* ¶¶23-25, which is powerful evidence that race is considered and used, EEOC, *Facts About Race/Color Discrimination*, perma.cc/L4XM-8JWD (archived Aug. 28, 2026). And the Foundation's practices have, in fact, resulted in the complete exclusion of non-blacks. *Supra* ¶29.

81. The Foundation also intentionally discriminates based on race by requiring applicants to live or study in a CBC member's district. This requirement facilitates the Foundation's racial discrimination by ensuring that the eligible applicant pool is disproportionately black. *Supra* ¶¶27-28. And even standing alone, the requirement is independently unlawful because it has the purpose and effect of discriminating in favor of black applicants. *Supra* ¶¶27-29. Antidiscrimination law is "offended by 'sophisticated as well as simple-minded modes of discrimination.'" *United States v. Fordice*, 505 U.S. 717, 729 (1992).

82. The Foundation did not change the scholarship's criteria or end its racial discrimination in the 2026 cycle. *Supra* ¶¶20-26. And the Foundation does not even purport to have eliminated the CBC-member requirement.

83. But even if it had eliminated the blacks-only eligibility requirement, the Foundation would still be liable. The Foundation concedes that, for over thirty straight years, it intentionally discriminated against non-black applicants by expressly rendering them ineligible for the scholarship. *Supra* ¶¶18-19. The "adoption and implementation of race-neutral policies alone" does not "suffice to demonstrate that" a longtime racial discriminator "has completely abandoned its prior … system." *Fordice*, 505 U.S. at 729; *see also Gratz*, 539 U.S. at 276 n.23 (equating the Fourteenth Amendment and §1981). A past discriminator must make "'every reasonable effort … to eradicate'" the prior discrimination "'and its insidious residue,'" including by "showing that the racial composition" is no longer lopsided, *United States v. Fletcher*, 805 F.3d 596, 601 (5th Cir.

2015), and by "not leav[ing] in place policies rooted in its prior officially [discriminatory] system," *Fordice*, 505 U.S. at 743. The Foundation has not performed this affirmative duty. It maintains statements that the scholarship is only for blacks. *Supra* ¶21. It has not shown that the scholarship's applicants or winners are no longer disproportionately black, *supra* ¶29, ¶35, or done anything to remedy that ongoing perception and reality, *supra* ¶¶30-37. And it has left in place its discriminatory CBC-member requirement.

84. The scholarship's discrimination implicates rights that §1981 protects. Because the statute protects the right to "*make* … contracts," 42 U.S.C. §1981(a) (emphasis added), it provides relief when discrimination "blocks the creation of a contractual relationship," *Domino's*, 546 U.S. at 476. A "contractual relationship need not already exist" because the law "protects the would-be contractor along with those who already have made contracts." *Id.* Because of that fact, a defendant violates "§1981 when, for racially motivated reasons, they prevented individuals who 'sought to enter into contractual relationships' from doing so." *Id.*

85. The CBC Foundation also discriminates in the performance, modification, and terms of its contracts. Section 1981 mandates equality in all the "benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b). Even if students of all races must give up the same rights to the Foundation when they apply, the Foundation extends different terms and benefits to students depending

on whether they are black—most obviously, an equal chance to apply or compete for the scholarship.

86. The Foundation's discrimination is the but-for cause of Plaintiffs' injuries. If the Foundation did not consider the race of applicants or their representatives, then Plaintiffs' members could apply and compete for the scholarship on an equal footing. *See Fearless Fund*, 2023 WL 6295121, at *4; *AGC of Cal. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991). And if they were black, each of Plaintiffs' members would be a highly competitive applicant for the scholarship. *Supra* ¶¶51-73.

87. Because the program violates §1981, it is subject to strict scrutiny. *Gratz*, 539 U.S. at 276 n.23. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995); *see Gratz*, 539 U.S. at 276 n.23 (same for §1981). And the Foundation "bears the burden" of proving that the scholarship satisfies that test. *Fisher v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up). It cannot meet that "daunting" standard. *SFFA v. Harvard*, 600 U.S. 181, 206-07 (2023).

88. The Foundation's interests are not compelling. The Supreme Court "ha[s] identified only two compelling interests that permit resort to race-based government action": "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the other is "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Neither exists here. The Foundation

does not even ask applicants if they have suffered prior discrimination. And a generalized interest in diversity is not compelling. *See Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998).

89. The program is not narrowly tailored to achieve any compelling interest. By barring non-blacks from the program, the scholarship imposes an illegal "quota," which is not narrowly tailored to any permissible goal. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989); *accord Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987). The Foundation at least treats being black as a positive, meaning it illegally treats race as a negative for non-black applicants in a zero-sum, competitive process. *Harvard*, 600 U.S. at 218-19; *see supra* ¶43. The Foundation has also conceded in this litigation that it could make the scholarship open to all races. It thus cannot show "the most exact connection between justification and classification" that strict scrutiny requires. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986); *Aiken v. Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994).

## PRAYER FOR RELIEF

90. Plaintiffs respectfully ask this Court to enter judgment in their favor and against the CBC Foundation and to provide the following relief:

A. A declaratory judgment that the CBC Spouses Education Scholarship violates 42 U.S.C. §1981.

B. A temporary restraining order and preliminary injunction that bars the Foundation, pending further order of the Court, from closing the program's application window or selecting winners.

C. A permanent injunction barring the Foundation from knowing or considering race in any way in the program—including by removing any criteria that perpetuate racial discrimination or that have a discriminatory purpose and effect.

D. Any equitable relief needed to undo the Foundation's discrimination or retaliation, including an order forcing the Foundation to eliminate its constituency requirement, to reopen the application process, to rerun the application process under race-neutral criteria, and to waive criteria like the one requiring applicants to be current college or graduate-school students.

E. Nominal damages of $1.

F. Reasonable costs and expenses of this action, including attorneys' fees and prejudgment interest, under 42 U.S.C. §1988 and any other applicable laws.

G. All other relief that Plaintiffs are entitled to.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Cameron T. Norris*

Thomas R. McCarthy
(D.D.C. No. 489651)
Cameron T. Norris
(D.D.C. No. VA083)
*Lead Counsel*
R. Gabriel Anderson
(TX Bar #24129302)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com

*D.D.C. bar application forthcoming

*Attorneys for Plaintiffs*